Filed 12/18/15  P. v. Edwards CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066007 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN317607) |
| JOHNNIE LEE EDWARDS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Diego County, Kathleen M. Lewis, Judge.  Affirmed in part and reversed in part with directions.

Michael Bacall, under appointment by the Court of Appeal, for Defendant and Appellant Johnnie Lee Edwards.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Maiava Mautofu.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

The district attorney by amended information charged defendants and appellants Johnnie Lee Edwards and Maiava Mautofu (sometimes, defendants) with three counts of robbery (Pen. Code,[1] § 211; counts 1, 2 & 3); four counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 4, 5 & 6); and first degree burglary (§§ 459 & 460; count 8).[2] The amended information also charged Mautofu with illegal possession of a firearm and/or ammunition (§ 30305, subd. (a)(1); count 9).

The amended information further alleged that counts 1 through 8 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); that Mautofu in counts 1 through 3 personally used a firearm in the commission of the robberies (§ 12022.53, subd. (b)); and that Edwards in counts 1 through 3, although not personally armed with a firearm, was vicariously liable for committing a felony while armed within the meaning of section 12022, subdivision (a)(1). Finally, the amended information alleged that Mautofu had one prior conviction that qualified as both a strike and a serious felony conviction (§§ 667, subds. (b)-(i) & 667, subd. (a)(1)).

---

[1]     All further statutory references are to the Penal Code.

[2]     Also charged in the amended information were codefendants Gregg Leauanae, Judd Liulamaga and Sam Niu, Jr. (codefendants). The codefendants' cases were severed from the instant case after the preliminary hearing.

2

Mautofu waived jury on count 9 and the bifurcated prior allegations.  The jury found defendants guilty as charged and found all the allegations to be true.  The court found Mautofu guilty of count 9 and Mautofu admitted the truth of the prior allegations.  The court sentenced Edwards to 32 years, and Mautofu to 59 years 8 months, in state prison.

On appeal, Edwards[3] contends that he was denied due process because the pretrial identification procedure was impermissibly suggestive and that he was denied effective assistance when counsel failed to object to the identification evidence.

Mautofu contends the court erred when it (1) refused to dismiss the entire jury pool following statements by a prospective juror during voir dire that he contends "tainted" the pool; and (2) instructed the jury, in response to a question posed by the jury during deliberations, that the offense of burglary could be completed by entry to a room within a single-family residence, after the prosecution for tactical reasons expressly stated they were not relying on that particular theory.  Mautofu also contends—and the People

---

[3]     Each defendant joined in all arguments raised by the other, to the extent those arguments accrued to each other's benefit and were not inconsistent with any of his own arguments.  (See Cal. Rules of Court, rule 8.200(a)(5) [providing: "Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal"].)  We note our high court recently criticized blanket joinders in claims raised in a multiple defendant appeal.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*) [stating "[w]e strongly disapprove of this seriously improper tactic"].)  That court concluded that, although joinder is broadly permitted, California Rules of Court, rule 8.200(a)(5) is not satisfied by "cursory and unfocused statements" of joinder.  (*Bryant*, at p. 363.)  Here, although neither Edwards's nor Mautofu's joinder is particularized with respect to any claims and/or issues raised by the other, we accept the joinders to the extent one defendant's argument accrues to the benefit of the other.  (See *id.* at pp. 363–364; see also *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

concede—that his sentence on counts 4, 5, 6 and 7 must be reduced because assault with a semiautomatic firearm (§ 245, subd. (b)) is a serious but not a violent felony within the meaning of section 186.22, subdivision (b)(1)(B) & (C). Finally, Mautofu contends that the amended information provided insufficient notice with respect to the gang enhancement under section 186.22, subdivision (b)(1) because it failed to specify whether the qualifying felony was serious, violent or neither for purposes of subdivision (b)(1)(A), (B) or (C) of that statute.

As we explain, we conclude the sentences on counts 4, 5, 6 and 7 must be reduced because assault with a semiautomatic firearm (§ 245, subd. (b)) is a serious but not a violent felony within the meaning of section 186.22, subdivision (b)(1)(B) & (C). In all other respects, we affirm the judgments of convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

Benjamin Lien testified he along with a group of friends in early-April 2013 were invited to a party in San Marcos at the house of Michael Nash. Esther Gray, Lien's then girlfriend, Christian Ross, Jesse Yakuta and Illuminato Mogavero also attended the party. When Lien arrived around 10:30 or 11:00 p.m., he estimated about 20 people were at the party. As the evening wore on, however, he estimated the party grew to about 30 or 40 people.

At some point later in the evening, Lien was in the backyard when a group of five men, all of whom were either Samoan or African-American (sometimes, the group),

4

arrived at the party. Lien testified the group stuck together, and he heard one or more members of the group refer to themselves as being part of a "blood -- deep valley blood gang." At one point, Lien introduced himself to a few of the group members.

Later in the evening, Lien went outside in the front of the house to smoke a cigarette. As he walked outside, three or four members of the group followed him. When he asked one of the men if a black car in the driveway belonged to one of them in the group, a man standing about two feet away pulled out a handgun and pointed it at Lien's head. Lien testified he was "face-to-face" with the man holding the gun. Prior to having a handgun pointed at his forehead, Lien testified there had been no confrontation or hostility between him and the members of the group. Lien in response "froze."

The man holding the gun next asked Lien if he had any money. Lien testified that man was Mautofu, whom Lien identified later that night at a curbside lineup and also in court. Lien further testified that he drank two beers and less than five shots during the course of several hours on the night of the robbery; that he also took a few "drags of a blunt," which he described as a cigar with marijuana in it; that he felt "buzzed" but that the alcohol did not affect his ability to "do things"; and that it was "very sobering" after the gun was pointed at his head, when he stated "adrenalin kicked in and everything was very quick."

Lien testified that he was next told to take off his shoes and his jacket and that another man from the group then took Lien's backpack. Lien told the men there was no money in the backpack and to go ahead and search it. In response, one of the men from

5

the group said, " 'I'm sorry to hear that,' " and then another man from the same group said, "Go ahead and ace him," which Lien surmised meant that they were going to shoot him in the head. Next, Lien was told to get on his knees, which he did, while the man later identified as Mautofu continued to point a gun at Lien's head.

Once on his knees, Lien testified he saw Gray and Ross come into the front yard from the direction of the garage. The gunman in response pointed the gun at Ross. Lien saw Ross drop to his knees. Lien testified shortly thereafter a few other partygoers came out the front door. Lien heard some commotion and heard one of the partygoers say that the "guy with the gun wasn't actually going to shoot" and that the guy with the gun should " 'go ahead and shoot me [i.e., the partygoer].' " One of the men in the group in response punched that partygoer in the face.

Lien next saw Yakuta come out the front door. Shortly thereafter, a car pulled up; the group got inside and left.

Although in "shock," Lien remembered his cell phone had an "app" on it that allowed him to track his phone at all times. He and Gray went to Gray's house, and he used a computer to locate his cell phone. They then went back to Nash's house, and Lien provided the police with an address where he believed his phone was located. Lien estimated it was less than 10 minutes from the time the group drove away to the time he used the computer to locate his cell phone.

Lien testified after he gave police a statement he was asked to participate in a curbside lineup. As discussed in more detail *post*, Lien testified when they arrived at the

6

lineup there were a line of police cars each with a witness inside. Lien separately identified all five suspects at the curbside lineup as the group members from the party. Lien testified he immediately recognized at the curbside lineup the man who had pointed the gun at his head. Lien also identified personal property taken during the robbery that police found in the suspects' car.

Victim Ross testified he also attended Nash's house party. During the course of the evening, Ross noticed the group arrive at the party. Ross stated all the group members were either Samoan or African-American. Ross saw the group in the backyard. He went outside and introduced himself. Ross said one or more men in the group said they were from Oceanside. A little later in the evening, Ross and one of the men from the group sat down on a couch in the living room and talked. Ross described that man as Samoan, with a beard, tattoos and short hair.

Ross testified that at some point after midnight, Gray approached him in a "slight state of panic" and said something was going on outside in front of the house. At the time, Ross was "[s]lightly more than buzzed" from the affects of alcohol. Ross in response attempted to use the front door to go outside but found it was being held from the other side. Ross said he could "feel" somebody holding the door from the outside because when he tried to move the door it opened "just a little bit." As such, Ross ran through the house into the garage.

Ross testified he opened the garage door and went outside. As he approached the driveway, he saw Lien on his knees with his hands behind his head and a "guy with a

7

gun" near a car in the driveway. Ross also saw Yakuta with his shirt off, sitting down. The man pointed the gun at Ross, who was about three or four feet away from the man. He told Ross to get to the ground.

Ross testified he immediately recognized the man holding the gun as the Samoan man he had spoken with on the couch a little earlier. The man told Ross to empty his pockets. After Ross pulled out his wallet, earphones and keys among other items, another man from the group picked up the items. Shortly thereafter, others from the party started coming out the front door, including one partygoer later identified as Mogavero who, according to Ross, refused to get to the ground and instead yelled, " 'You have to shoot me. If you are going to do it, just shoot me.' "

Ross identified Mautofu at trial as the man holding the gun. Ross testified Mautofu was *also* the same man he had spoken to at the party while sitting on the couch. Ross testified Mautofu's appearance at trial was a "little different" than his appearance on the night of the robbery. Ross also identified Edwards as one of the men in the group involved in the robbery. Ross testified Edwards was the man who punched the partygoer after the partygoer refused to get to the ground. After the robbery, Ross saw the group walk towards the end of a cul-de-sac, get into a car and drive away.

Ross testified he also was taken to a curbside lineup later that night. Police told Ross as he sat alone in the squad car that a line of squad cars with witnesses would drive in a circle and that Ross was to say "yes or no" if he identified any of the suspects as being involved in the robbery. Ross testified he identified four of the five suspects as

8

members of the group from the party, including the man who had pointed the gun at him. Ross stated a few of the suspects he identified were then wearing different shorts and/or hats from what they had been wearing at the party, but that he nonetheless was able to identify the four suspects "fairly quickly." Immediately after the curbside lineup, police returned Ross's cell phone and keys that had been taken during the robbery.

Nash testified sometime during the course of the night a group of four or five individuals, who were either Samoan or African-American, arrived at his party. Although Nash did not know any of these individuals, he introduced himself and decided the group could stay after his initial interactions with the group were "good."

Later that night, Gray approached Nash and said there was a "major problem going on." Nash described Gray's demeanor as "very serious." Because Nash was managing the party and because he believed he was too drunk to handle the situation, he told Gray to ask one of their friends for help. Nash testified he then went to the garage and found four men from the group. The lights in the garage were dim and according to Nash, the four men were just standing there, "straight faced," not talking and not appearing to have fun.

Nash testified the next morning he realized several items from the house were missing, including his laptop; his 1800's coin collection; his saxophone; and one of his brothers' gaming consoles. Nash testified he kept his laptop in the top drawer of his dresser in his bedroom, located upstairs. Nash's coin collection was also missing from

9

his bedroom, which he stored in a box in his closet. As for his saxophone, Nash said he kept it in the garage.

Nash testified that, shortly before the party began, he locked two upstairs bedrooms belonging to his brothers. The next morning, Nash found the doors to his brothers' bedrooms both damaged. When Nash went inside one of his brothers' rooms, he found a gaming console was missing. Nash had seen the console in the top drawer of his brother's dresser the night before. When Nash went into his other brother's room, he found that all of the drawers from the dresser had been "turned out" and a laptop was missing.

Gray testified she also attended Nash's party. During the evening, Gray noticed the group standing together in the backyard of Nash's house. Gray testified that she quickly introduced herself to the members of the group and that initially they seemed "pretty social." Gray heard members of the group telling Lien, her then boyfriend, they were "Deep Valley Bloods" from Oceanside. Although Gray recognized the group had gang ties, she initially was not concerned until Lien told the group he also was from Oceanside, which one member of the group in response said, "that was unfortunate." As a result of this statement, Gray kept an "eye" on Lien during the party out of concern for his safety.

Later in the evening, Gray observed Lien and one of the men from the group, whom Gray identified at trial as Mautofu, go into the front yard to smoke a cigarette. Shortly thereafter, Gray observed the rest of the group follow Lien and the man outside.

10

Concerned Lien was going to be "jumped," Gray went outside but was " 'ushered back inside the house' " by a man from the group Gray later identified as Edwards. Gray testified the man was "pushing" her and a few other women back inside the house and telling them they could go outside shortly. Concerned for Lien, Gray told the man she needed to talk to her friend outside. According to Gray, the man responded, ' "You can talk to him in a little bit.' " When Gray repeated she needed to talk to her friend " 'now,' " the man repeated she could talk to Lien in a " 'little bit.' "

Gray testified she found Ross and told him about the situation outside. Ross and Gray returned to the front door and attempted to go outside. According to Gray, it appeared someone was holding the door closed from outside because Ross was turning the doorknob and pushing on the door, but he was unable to open it. Ross then went to the garage while Gray ran outside into the backyard to access the front yard through a gate. Gray testified she was unable to get through the gate, however, because one of the men from the group had his "arms crossed on top" of it to keep it closed.

Although Gray could not get through the gate, she testified she saw Lien and Ross kneeling on the front yard with a man from the group holding a gun to Lien's head. Both Lien and Ross had their hands behind their head. Gray estimated the man with the gun was standing about two feet away from Lien. Gray identified Mautofu at trial as the man holding the gun to Lien's head. Frantic, Gray ran back inside the house and tried to get someone to call the police. Gray said she could not call the police herself because her cell phone battery was "dead."

11

Gray testified she next ran into the garage and opened up the garage door about three or four feet to look outside. While still inside the garage, Gray saw that Lien and Ross had taken off their shoes and their jackets and that their "stuff" was on the ground, including Lien's backpack. Gray also then saw Yakuta outside, on the ground. Gray again ran back inside the house and yelled for the partygoers to " 'get outside.' " At that point, some of the partygoers responded to Gray's request because according to Gray, some of them had tried to leave the party through the front door but could not do so, which caused them to "freak[] out." Gray and a few others went back to the garage, and Gray saw the group get into a car and leave.

Gray testified she and Lien drove to her house so Lien could access an "app" on his cell phone to locate the phone. Once Lien located his cell phone, they drove back to Nash's house and gave the information to police. Gray estimated about 15 minutes had passed from the time the group left the party to the time they gave police the information regarding the location of Lien's cell phone.

Victim Yakuta testified he also attended Nash's party on the night of the robbery. At some point during the night, Yakuta saw a group of four or five men, whom he identified as being either Samoan or African-American, walk through the front door into the party. Yakuta observed the group initially were not doing much socializing but instead were "exploring" and "looking for things" inside the house. When Yakuta saw the group, he testified he became "worried" because they looked "suspicious" and he did not know any of the group members.

12

Later in the evening, Yakuta went into the backyard of the house, through the gate and into the front yard. Yakuta saw his friend Lien on his knees with his hands behind his head. Yakuta saw one of the men from the group pointing a gun at Lien's head. Lien identified Mautofu as the man who was pointing the gun at Lien.

Yakuta testified when he first walked outside he heard Lien tell the man holding the gun, " 'that's not a real gun,' " or words to that effect. The gunman in response pulled the top of the gun back, and Yakuta saw a bullet ejected. The man holding the gun then noticed Yakuta, pointed the gun at him and demanded he move next to Lien. Yakuta complied, kneeled about two away from Lien and put his hands behind his head. The men holding the gun then told Yakuta, " '[e]mpty your pockets or we'll shoot you.' " Yakuta removed his phone and some money and put them on the ground. Yakuta begged the man holding the gun not to use it.

As he was on the ground, Yakuta saw his friend Ross come outside. When Ross saw the gun, Yakuta heard Ross say in a confrontational tone, "What was going on?" The man holding the gun pointed it at Ross and demanded Ross also get to his knees. Ross reluctantly complied and emptied his pockets, as directed by the gunman. Yakuta next saw a partygoer—later identified as Mogavero—come outside. The partygoer refused the gunman's demands to get to the ground and instead rushed the gunman and started fighting. The gunman in response told the rest of the group, " 'Let's just get out of here.' " After the group left, Yakuta called 911. Yakuta testified he was in shock after being robbed at gunpoint.

13

Victim Mogavero testified he attended the party at Nash's house. Mogavero walked out the front door to leave the party, and someone told him to get on the ground. Mogavero saw two or three other people already on the ground and saw a man holding a gun. The man next pointed the gun at Mogavero. Instead of going to the ground, Mogavero stepped toward the individual and tried to grab the gun. As he did so, Mogavero was punched by somebody and knocked to the ground. Mogavero testified he got up and walked back inside the house. Mogavero later discovered his wallet missing.

Deputy Sheriff Heather Bruton testified she responded about 1:45 a.m. that same night to a noise complaint where she encountered a dark-colored car with five occupants parked under a carport. No arrests were then made. However, about an hour later Deputy Bruton heard the call about the armed robbery at the Nash house, which included a description of the suspects and their car. Deputy Bruton determined the car and the occupants she had contacted a little earlier regarding the noise complaint may have been involved in the armed robbery. As such, Deputy Bruton drove back to the vicinity of the earlier contact and saw the same dark-colored car again with five occupants.

After backup arrived, the suspects were removed from the car. Deputy Bruton did a quick search of the car and found a dark-colored backpack on the floorboard behind the driver's seat. Inside the backpack, Deputy Bruton found a nine-millimeter Glock handgun with a 10-round magazine containing nine rounds. Deputy Bruton also found cell phones belonging to the victims. In the trunk of the car, police found other property belonging to the victims, including a laptop computer, a wooden box containing

14

miscellaneous coins, wallets containing the identification of Mogavero and Ross, and a game console/system. All five suspects were arrested.

B. *Defense Case*

The identification of defendants was the "most seriously contested issue[] at trial." Dr. Mitchell Eisen, Ph.D. testified as an eyewitness identification expert for the defense regarding psychological research on issues of eyewitness identification and suggestibility. Dr. Eisen compared human memory to a camera and noted that, unlike a snapshot from a camera which "captures everything within the aperture of its lens," human memory has "limits . . . on how much information we can take in [at] any given time and how perfectly we recall it over time. More importantly, unlike a camera human memory is malleable, it's changeable. . . . If we are to reconsider a new detail, we think it over, talk about it with our spouse and say, remember this happened that way. We might consider their perspective and we might decide to change and say, yeah, you're right, it was that way, it wasn't my way. So human memory is malleable."

Dr. Eisen noted that attention also is a component of memory, and noted another way human memory differs from a camera is that humans "have limits on [their] retentional capacity." That is, even a "really sharp, attentive" person does not "get everything" because according to Dr. Eisen, humans "daydream," "drift off," and "hear words and everything, but . . . won't pay enough attention to consolidate that memory"— "taking it from short term to . . . long-term memory."

15

Dr. Eisen also addressed the affect stress, trauma and "traumatic stress" have on memory and memory retention, noting that in life-threatening situations humans tend to narrow their focus and, thus, have less ability to use their "cognitive resources to focus on the other details of the events that [they] normally would be able to process . . . ."

Dr. Eisen also testified regarding the affects of alcohol consumption on eyewitness identification. Dr. Eisen noted that, in studies, those who were intoxicated tended to be "worse at picking out the individual in their presence and more likely to falsely identify an innocent suspect" as compared to "sober participants." He also noted that, as a person became more intoxicated, that person's "limits on attention, on memory" were affected to a greater extent.

Dr. Eisen also testified that research demonstrated the "error rate[]" was higher when showing a "witness a single person or photo when using the showup procedure, compared to showing a witness a group of people or photos when using a live lineup procedure." In the latter procedure, he noted there is only one suspect and five people who are "fillers," whereas in the former procedure a witness shown just one suspect or a single photograph may make "assumptions" that the one suspect is the culprit. Dr. Eisen thus noted using a six-pack lineup as opposed to a single photograph to identify a suspect provided "protection against chance misidentifications."

16

I

Discussion

A. *Ineffective Assistance of Counsel/Curbside Lineup*

1. Additional Background

Shortly after the suspects' arrest, as noted Lien, Ross, Gray and Yakuta (sometimes, witnesses) took part in a curbside lineup to identify possible suspects. Each witness was separately driven by one or more deputy sheriffs to a location where the suspects had been detained. The police cars lined up single file. The suspects, who were in separate patrol cars, were then brought out one at a time, were illuminated with light from the patrol cars, and were separately shown to each witness from about 30 feet away.

Before identifying possible suspects, each witness was admonished with a "curbside lineup form" approved by the department that was read verbatim to the witnesses as required by department policy. The admonishment provided:

" 'I want you to look at someone we have detained. Do not conclude from the fact that we have detained someone that he/she is the guilty party. You are not obligated to identify anyone. It is just as important to free an innocent person as to identify a guilty person. Be aware that sometimes people who commit crimes will try to disguise their appearance by changing clothing, wearing hats, sunglasses or wigs. Do not say anything or make gestures (nod, point etc.) until you have totally viewed this person.' "

Lien testified that after he gave police a statement at the Nash house he was asked to participate in the curbside lineup; that he rode in the back of a police car to the lineup;

17

that when they arrived at the lineup there was a line of police cars with other witnesses inside; that he could not hear or see anything that was going on with the other witnesses in the other police cars; and that he could not see the individual suspects being brought out for the lineup until it was his turn for the showup. Before it was his turn, Lien saw a car that looked similar to the getaway car used by the suspects. Deputy Sherriff Sean Zappia testified that he drove Lien to the curbside lineup and that Lien then did not exhibit any objective symptoms commonly associated with alcohol and/or marijuana consumption.

Lien identified all five individuals at the curbside lineup as members of the group who had been at the Nash party. Based on the man's facial features, build and facial hair, Lien immediately identified Mautofu as the man who had pointed the gun at Lien's head during the robbery.[4] Lien identified Edwards as the individual from the group who took his backpack, wallet and cell phone. After the curbside lineup, police next drove Lien to a parking lot where he identified his backpack, wallet and cell phone, which police had found in the getaway car.

At the curbside lineup, Ross identified four of the five suspects as members of the group that had earlier attended the Nash party. Of the four he recognized, Ross identified the role three of those members played in the robbery, including the man who pointed the

---

[4]    During cross-examination, Lien admitted that at the preliminary hearing he identified codefendant Liulamaga as the gunman in the robbery. However, at trial Lien identified Mautofu as the gunman and stated he was clearer with his identification of the gunman at the curbside lineup than at the preliminary hearing.

gun at him, the man who held the front door closed while Lien was being robbed and the man who collected the victims' property. Deputy Sheriff Jeremy Bedingfield testified that he drove Ross to the curbside lineup and that Ross then did not appear intoxicated or under the influence.

Yakuta at the curbside lineup positively identified three of the suspects as being members of the group involved in the robbery and two others as possibly involved. Yakuta identified Mautofu as the man who pointed the gun at him during, and Edwards as being possibly involved in, the robbery.[5]

Gray testified that she identified Edwards at the curbside lineup as the man from the group that "ushered" her back inside the Nash house as she attempted to go outside and talk to Lien; and that Mautofu was likely the gunman, although she then was not "100 percent" certain regarding Mautofu's role in the robbery. Deputy Sherriff Anthony Mireles testified that he transported Gray to the curbside lineup and that she then did not appear to be under the influence of alcohol and/or marijuana.

Detective Samuel Sheppard testified he interviewed the witnesses about a week after the robbery. Detective Sheppard showed each witness the photographs of the five individuals who had been arrested after the robbery. As Detective Sheppard showed the individual photographs of the five suspects, he asked each witness what "role" each suspect had played in the robbery.

---

[5] Yakuta at the preliminary hearing identified codefendant Liulamaga as the gunman. Yakuta testified at trial that he was "misled" by Mautofu's appearance at the preliminary hearing because Mautofu then had no facial hair and wore glasses.

On seeing a photograph of Mautofu, Ross told Detective Sheppard, " 'that's the dude with the gun.' "  Ross also told Detective Sheppard that, earlier in the evening on the night of the robbery, he had been "rapping" with Mautofu; that Edwards was standing next to Mautofu during the robbery; and that during the robbery Edwards was the individual who struck one of the partygoers who refused to get to the ground.

Detective Sheppard testified Gray reviewed the five photographs including of Mautofu.  Gray told Detective Sheppard that Mautofu was involved in the robbery and that he may have been the gunman.  Gray also told Detective Sheppard during the interview that codefendant Liulamaga also could have been the gunman and that Edwards was the man holding the front door closed during the robbery.  Gray on redirect examination testified that she was most certain, however, that Mautofu was the gunman.

Detective Sheppard also showed Yakuta the photographs of the five individuals. Yakuta identified Mautofu from the photograph as the gunman.  He identified Edwards and codefendant Niu as the individuals holding the doors during the robbery and codefendant Liulamaga as the individual that was standing near Mautofu collecting the victims' property.

Edwards (joined by Mautofu) contends the in-court identification of him must be suppressed because it allegedly was tainted by a suggestive and unnecessary one-person curbside lineup on the night of the robbery and by a suspect-only photo interview about a week later between Detective Sheppard and the various witnesses.  Edwards also

20

contends his counsel rendered ineffective assistance by not moving to suppress the identification evidence.

2. Guiding Principles and Analysis

" ' "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions.  [Citations.]  'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' "  [Citations.]  It is defendant's burden to demonstrate the inadequacy of trial counsel.  [Citation.]  We have summarized defendant's burden as follows: " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' "  [Citation.]  [¶]  Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  [Citation.]  Defendant's burden is difficult to carry on direct appeal, as we have observed: " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively

21

discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " [Citation.]' [Citation.] If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.) "[D]efense counsel's decision not to file a motion he believes will be futile does not ' " 'substantially impair' . . . defendant's right to effective assistance of counsel." ' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804.)

Edwards contends there is no satisfactory explanation for his counsel's failure to object to the "extraordinarily suggestive" curbside lineup and subsequent photographic showup. It is axiomatic that " ' "[i]n deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances." ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942.) "The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) "A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)

22

Turning first to the curbside lineup held shortly after the robbery, we note that the "law favors field identification measures when in close proximity in time and place to the scene of the crime, with the rationale for the rule being stated: 'The potential unfairness in such suggestiveness . . . is offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later." (*In re Richard W.* (1979) 91 Cal.App.3d 960, 970.) "Prompt identification of a suspect who has been apprehended close to the time and place of the offense 'aids in quickly exonerating the innocent and discovering the guilty.' " (*People v. Irvin* (1968) 264 Cal.App.2d 747, 759; see *In re Carlos M.* (1990) 220 Cal.App.3d 372, 387 [noting "single-person show ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended"].)

In *People v. Burns* (1969) 270 Cal.App.2d 238, 244-245, a curbside lineup was held constitutionally valid when a single suspect was illuminated by police spotlights and flashlights. In that case, the defendant wore a nylon stocking over his head to rob a gas station. The victim saw the defendant's getaway vehicle, which police stopped a few minutes later. The police then drove the victim to where the defendant had been stopped. Based on the defendant's clothing, the victim identified the defendant as the robber from

about 60 feet away. (*Id.* at p. 244; see also *People v. Floyd* (1970) 1 Cal.3d 694, 714, quoting *Stovall v. Denno* (1967) 388 U.S. 293, 302 [noting a " 'single person showup' is not inherently unfair"].)

As to the status of Edwards as a detainee, we note numerous cases have approved of curbside identifications under similar circumstances. (See *People v. Craig* (1978) 86 Cal.App.3d, 905, 914 [rejecting the argument an identification procedure was unduly suggestive because the suspect was handcuffed in the back of a patrol car]; see also *People v. Rodriguez* (1987) 196 Cal.App.3d 1041, 1049-1050 [noting the presence of getaway car used in commission of crime at in-field showup was not unduly suggestive]; *People v. Colgain* (1969) 276 Cal.App.2d 118, 128 [single suspect was handcuffed]; *People. v. Romero* (1968) 263 Cal.App.2d 590, 593 [noting a confrontation or "lineup" was not "objectionable solely because the suspect was viewed with a policeman by the victim" and noting that "[n]o principle of justice rooted in our traditions and conscience as a people is offended by the course which was followed," namely when the victim was taken to the police station about 30 minutes after a burglary incident and warned to be "sure" he picked the right person or persons involved in the burglary].)

Further, the facts belie Edwards's theory of undue suggestiveness. Although all five suspects presented in the curbside lineup were detained, the record shows only Lien was able to identify all five as being in the group at the party, and with respect to some of the group members, their roles in the robbery. Gray and Ross identified four of the five, and Yakuta three of the five, members of the group and the roles some of them played in

24

the robbery. In other words, the witness identifications were not based on the mere fact of detainment.

The record also shows that each witness was separately transported to the curbside lineup; that each witness was properly admonished with the department's curbside lineup form, where they were instructed not to conclude merely because a person was detained he or she was guilty and it was just as important to free an innocent person as to identify a guilty one; that each witness was shown each of the suspects separately; that each witness was unable to hear or see whether the other witnesses were able to identify one or more of the suspects during the lineup; that before the curbside lineup, each of the witnesses had already given statements to the police regarding the suspects and the robbery; and that the lineup occurred less than a few hours after the robbery.

We thus independently conclude from such evidence there was "sufficient aspects of reliability" to support the admission of the in-court identification evidence of Edwards. (See *Manson v. Brathwaite* (1977) 432 U.S. 98, 106, 114; see also *People v. Lucas* (2014) 60 Cal.4th 153, 235 [noting " '[w]e review deferentially the trial court's findings of historical fact [if any], especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive' "].)

Moreover, even *if* we concluded that the curbside lineup was unduly suggestive, we nonetheless conclude under the totality of the circumstances that the in-court identification of Edwards was nevertheless reliable. (*People v. Gonzalez*, *supra*, 38

25

Cal.4th at p. 942.) All the witnesses saw Edwards at the Nash party *before* the robbery. Indeed, Edwards and the rest of the group were at the party for what the record suggests was about an *hour*, if not longer, talking to partygoers including witnesses Lien and Ross, drinking and socializing. At one point during the party the man later identified as Mautofu was "rapping" with Ross while sitting on the couch in the living room.

What's more, right before the robbery Gray testified Edwards "ushered" her back into the house when she saw Lien in the front yard with another man from the group. Gray testified Edwards stood at the front door and prevented her and others from going outside, while also *repeatedly* refusing her pleas to let her outside to speak to, and be with, Lien. Thus, the record shows the witnesses had a good opportunity to view Edwards and the rest of the group, including Mautofu (who has joined in this issue), both before and in connection with the robbery. (See *Manson v. Brathwaite*, *supra*, 432 U.S. at p. 114 [noting the factors to consider in determining reliability include among others the opportunity of the witness to view the suspect or suspects, the level of certainty at the confrontation and the time between the confrontation and the crime].)

That one or more of the witnesses had consumed varying amounts of alcohol and/or used marijuana before the robbery does not change our conclusion on this issue. At most, the issue of the witnesses' varying levels of intoxication went to the weight and not the admissibility of the identification evidence. (See *People v. Gonzales* (1968) 68 Cal.2d 467, 472 [noting "[l]ack of positiveness" as to identity "went to the weight and not to the competency of the evidence"]; *People v. Jones* (1963) 221 Cal.App.2d 408, 409

26

[noting the "strength or weakness of identification is a matter solely within the province of the jury" and noting a "jury's determination must be upheld unless the evidence of identification is inherently improbable or incredible as a matter of law"].)

In any event, the record shows both Lien and Ross testified the stress of having a gun pointed at them was "sobering." In addition, Ross stated he stopped drinking about 11:00 p.m., a few *hours* before the robbery, because he ran out of money. Yakuta stated he had less than three beers during the course of the night because the group's presence at the party made him nervous. And the deputies that separately drove the witnesses to the curbside lineup after the robbery each testified that the witnesses then showed no obvious signs of intoxication.

We also reject Edwards's contention that the single photographs of the suspects shown by Detective Sheppard to the witnesses about a week after the robbery rendered the witnesses' in-court identifications inadmissible. The record shows that, when Detective Sheppard showed the witnesses the individual photographs including of Edwards, he was merely trying to ascertain the *role* each of the suspects played in the robbery, inasmuch as the witnesses *already* had identified Edwards at the curbside lineup as a suspect in the robbery. We thus independently conclude that showing the witnesses an individual photograph of Edwards after the witnesses previously had identified him at a curbside lineup was not unduly suggestive as to give rise to a "very substantial likelihood of irreparable misidentification." (See *Simmons v. United States* (1968) 390 U.S. 377, 384; see also *People v. Lucas*, *supra*, 60 Cal.4th at p. 235.)

27

However, even *if* we concluded that the curbside lineup on the night of the robbery and the single-person photographs shown to the witnesses about a week later were unduly suggestive, *and* even *if* we concluded that the in-court identifications were not otherwise reliable, we still would conclude that any alleged error in admitting the eyewitness identification testimony was harmless beyond a reasonable doubt. (See *People v. St. Germain* (1982) 138 Cal.App.3d 507, 519, citing *Chapman v. California* (1967) 386 U.S. 18, 24.)

As noted, Edwards and the others in the group matched the description of the suspects given by multiple witnesses. As also noted, shortly after the robbery Edwards and the other group members were found in a vehicle that also matched the description given by witnesses. In that vehicle, police found a gun and personal items taken from the victims including cell phones and wallets, as well as other property taken from the Nash house. In addition, the record shows that Lien was able to determine the location of his cell phone taken during the robbery by use of an "app," which information police used in part to locate the group that included Edwards. In light of such evidence, we conclude any alleged error in admitting the in-court identifications of Edwards was harmless beyond a reasonable doubt.

In light of our conclusion that the in-court identifications were properly admitted, we further conclude that Edwards has not met his burden of showing ineffective assistance of counsel. His counsel could have reasonably determined, under established

law, that a motion to suppress would be unmeritorious. (See *People v. Gutierrez*, *supra*, 45 Cal.4th at p. 804.)

In addition, the record shows defense counsel did not ignore the identification issue. To the contrary, defense counsel presented the expert testimony of Dr. Eisen, who testified at length about the unreliability of eyewitness identifications, including about how "traumatic stress" and alcohol can negatively affect a witness's memory and attention.

Finally, the record shows defense counsel thoroughly cross-examined each witness regarding his or her identification of Edwards, including in connection with (i) the curbside lineup on the night of the robbery, (ii) the police station interview about a week later, *and* (iii) the preliminary hearing. The record also shows defense counsel thoroughly addressed the identification issue in closing arguments in aggressively arguing that Edwards was merely an innocent bystander in the robbery.

In light of our conclusion the identification evidence was properly admitted, and in light of the defense's aggressive attack of the witnesses' identification of Edwards as one of the participants in the robbery, we conclude he is unable to establish that defense counsel was "deficient" in failing to object to the identification evidence. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) However, even *if* his counsel was deficient in not objecting to such evidence, given the other evidence of guilt, as summarized *ante*, we further conclude Edwards cannot establish that, absent this alleged deficiency, it was reasonably probable a determination more favorable to him would have

29

resulted. (See *id.* at p. 694; compare *People v. Nation* (1980) 26 Cal.3d 169, 174, 179–180 [noting defendant received ineffective assistance after counsel failed to challenge identification testimony based on the "extraordinary suggestiveness" of the pretrial identification process when three girls together went to a police station, after a man had pointed a gun at them and took one of the girls into some nearby bushes and had raped her, and one of the girls identified defendant in a mug shot as the attacker and then informed the other two of her finding, who then, after some discussion, all agreed defendant was the attacker—despite the fact the victim had been considering another suspect's photograph, and when the police thereafter gave the girls *only* defendant's photograph to take home to show other possible witnesses].)

B. *Dismissal of Entire Jury Panel*

Mautofu (joined by Edwards) contends the trial court abused its discretion and thus erred when it refused to dismiss the entire pool of jurors because of statements made during voir dire by prospective juror No. 19.

1. Additional Background

The record shows prospective juror No. 19 stated that he was retired from the Navy and that he had "friends in law enforcement," including in a gang division. In response to the trial court's question whether those relationships affected his ability to be fair, prospective juror No. 19 stated, "Usually when the district attorney brings up charges such as the preponderance of charges of these, they're probably true. And I would believe a police -- a law enforcement witness over a gang member."

30

The record shows the court next asked prospective juror No. 19 if both a police officer and a gang member testified, would he be "able to start them off on an equal setting and determine their credibility as you go on? Because . . . let's face it, everybody in every profession lies sometimes; there's good apples, there's bad apples. [¶] . . . [¶] That includes police departments. So I'm not saying that that's true here, of course. But, I'm not saying that someone who came in and had gang affiliations wouldn't come up and tell the truth, as well. So could you make a credibility determination based on that without any preconceived notions?"

Prospective juror No. 19 responded, "Based on my experience with these people, Your Honor, and what they've told me about the judicial process, getting to this far, usually the district attorney's office doesn't bring cases to court that would make them look ridiculous. . . . [¶] . . . [¶] It would be very, very hard to not take a law enforcement person's word, especially if he was corroborated by another law enforcement person." Before excusing prospective juror No. 19 for cause because he could not be fair, the court pointed out that the district attorney does bring charges where not guilty verdicts are rendered.

Defense counsel outside the presence of the jury panel requested that the court excuse the entire panel because it allegedly had been tainted by prospective juror No. 19's statements. The court denied the request, reasoning: "Well, first of all, I did mention to the juror in front of the panel that the DA also brings charges in which juries rendered not[]guilty verdicts. And also in my experience it's not uncommon for at least one juror

31

to make a comment like that during the case.  I don't think it's tainted the rest of the jurors, and each juror will be asked if [he or she] can be fair and impartial.  And so I'm going to deny your motion."

    2.  <u>Guiding Principles and Analysis</u>

"Just as a finder of fact is in a better position than the reviewing court to judge the credibility of a witness, the trial judge is in a better position to gauge the level of bias and prejudice created by juror comments."  (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1466.)  The trial court's decision on the question of "group [jury] bias" therefore "is entitled to great deference and is reversed on appeal only upon a clear showing of abuse of discretion.  [Citations.]"  (*Id.* at pp. 1466-1467.)  We apply a totality of the circumstances test in evaluating the affect of a prospective juror's statements on other prospective jurors.  (*Id.* at p. 1467; see *People v. Ramos* (2004) 34 Cal.4th 494, 515 [noting the "trial court's careful questioning of the panel ensured the removal of the first prospective juror, and there is no indication that the second prospective juror's remarks that he was influenced by the account of the unrelated murder affected the other prospective jurors or undermined the court's ability to empanel a fair and impartial jury"], citing *People v. Martinez*, *supra*, 228 Cal.App.3d at pp. 1465–1467.)

Our high court decision in *People v. Cleveland* (2004) 32 Cal.4th 704 informs our decision on this issue.  There, a prospective juror who was a retired law enforcement officer with substantial experience in homicide cases stated in voir dire his view that the death penalty was " 'too seldom [used] due to legal obstructions' " and that he could not

be fair to both sides " 'based on [his] knowledge of how these trials are conducted.' " (*Id.* at p. 735.) After a few more questions, the court completed the questioning of this juror outside the hearing of the rest of the prospective jurors and ultimately excused the juror for cause. (*Id.* at pp. 735-736.)

Much like Mautofu in the instant case, the defendant in *People v. Cleveland* argued the prospective juror's statements "tainted" the entire venire. In rejecting this argument, our high court noted "[m]any prospective jurors express many different general opinions regarding the judicial system. These expressions of opinion do not taint the jury. The comments here did not give the other prospective jurors information specific to the case, but just exposed them to one person's opinion about the judicial system. [Citation.] The circumstance that this particular opinion came from a retired peace officer with experience in homicide cases and trial proceedings does not change matters. It would no more prejudice a jury panel to hear that a retired (or active) peace officer believes the system is tilted in favor of defendants than to hear a criminal defense attorney express the opposite view. To the extent defendants argue the court should have held voir dire out of the hearing of the rest of the panel, the issue is not cognizable because they did not so request at trial. Moreover, the court had discretion to proceed as it did. [Citations.] . . . Again, the statement was just one person's opinion, not a judicial pronouncement or even a comment by the prosecutor." (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 736.)

Similar to the facts in *People v. Cleveland*, prospective juror No. 19 was merely expressing *his* personal opinion regarding the criminal justice system, based on what *his* friends in law enforcement had told him.  Much like the situation in *People v. Cleveland*, the statements at issue in the instant case were neither a judicial pronouncement nor made by counsel, nor statements specific to the case.

Moreover, the record shows in response to prospective juror No. 19's statements, the trial court stated in front of the *entire* jury panel that there were "bad apples" in every profession—including in "police departments"—and that it was common knowledge that district attorneys bring cases where not guilty verdicts are rendered.

Based on the totality of the circumstances, we conclude the court properly exercised its broad discretion when it denied the defense's motion to dismiss the entire jury panel.  (See *People v. Cleveland*, *supra*, 32 Cal.4th at pp. 735-736; compare *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630, 632-633 [reversing a conviction for sexual assault of a minor under age 14 because (1) during voir dire the court questioned a prospective juror who was a social worker with child protective services who stated that she had "expertise" in the area of sexual assault of minors, that sexual assault had been confirmed in all cases on which she had worked, and that in three years in her position, she had never become aware of a case where a child victim had lied about being sexually assaulted, *and* because (2) the court next asked the other prospective jurors whether anyone disagreed with these statements *and* "no one responded"].)

C. *Burglary Conviction*

Mautofu (joined by Edwards) next contends his burglary conviction must be reversed because the court, in response to a jury question, allegedly improperly instructed the jury during deliberations on a theory of burglary that for tactical reasons the prosecution had not relied on and because the court in doing so also failed to give a unanimity instruction.

1. Additional Background

The record shows when discussing jury instructions the prosecutor stated the People were "proceeding under the single theory that there was an entrance to the house itself with the intent to commit a theft." The prosecutor also noted that a "room is part of the house for purposes of a burglary." When the trial court inquired further, the prosecutor stated, "I'm not proceeding on the breaking of the locked bedroom door. I'm basically saying, but when they entered the house itself which would encompass -- I don't think the bedroom gets excluded because it's locked. I think you can enter the house. [¶] I'll refer to items taken from the bedroom, but under the general theory that the entrance to the house made by the defendants was with [the] requisite intent." The record shows the court in response instructed the jury with somewhat modified versions of CALCRIM Nos. 1700 and 1701.[6]

---

6      The court instructed the jury as follows with respect to count 8, burglary: "The defendants are charged in count 8 with burglary. To prove that the defendant is guilty of this crime the People must prove that: [¶] 1. The defendant entered a building. [¶] AND, 2. When he entered a building he intended to commit theft. [¶] To decide whether the defendant intended to commit theft please refer to the separate instructions that I will give you on that crime. [¶] A burglary was committed if the defendant entered with the intent

During deliberations the jury sent the following note:

"1. These Questions are in regard to count 8 -- burglary:

"A.) If the people proved that a theft occurred, is it required for a guilty verdict that the people <u>also</u> prove that the theft was premeditated by the defendants <u>before</u> they entered the house the <u>first</u> time?

"B.) OR, would it be sufficient for a guilty verdict if the people proved that the defendants were willing or open to engaging in theft <u>without</u> necessarily <u>planning</u> to engage in theft before entering the house the first time?

"C.) What if the defendants decided to engage in theft after entering the building the <u>first</u> time? For example, if a defendant first entered the building without the clear intent to engage in a theft and then <u>later</u> decided to engage in theft while in the backyard,

_____

to commit theft. The defendant does not need to have actually committed theft as long as he entered with the intent to do so. Under the law of burglary, a person enters a building if some part of his or her body penetrates the area inside the building's outer boundary. [¶] Burglary is decided in two degrees. If you conclude that a defendant committed a burglary you must then decide the degree. [¶] First degree burglary is the burglary of an inhabited house. A house is inhabited if someone uses it as a dwelling whether or not someone is inside at the time of the alleged entry. The house includes any garage that is attached to the house and functionally connected with it. [¶] All other burglaries are second degree. [¶] The People have the burden of proving beyond a reasonable doubt that the burglary was first degree burglary. If the People have not met this burden, you must find the defendant not guilty of first degree burglary. If you conclude that defendant [Mautofu] or Edwards committed a first degree burglary you must then decide whether anyone other than an accomplice was present inside the residence during the commission of the burglary. [¶] The People have the burden of proving beyond a reasonable doubt that someone other than an accomplice was present inside the residence during the commission of the burglary. If the People have not met this burden, you must find the defendant not guilty of this allegation."

36

upstairs hallway, garage, or front yard of the building, would that satisfy the requirement for a guilty verdict?

"2. Is there another lesser count available to the jury instead of count 8, that charges the defendants with theft -- absent an intent before entering the building?" (Emphasis in original.)

The court in response contacted counsel about the jury note, each of whom approved the following response:

"In order to find a defendant guilty of Burglary, the defendant must have entered the building with the intent to commit theft.

"If, for example, a defendant enters a building twice, and he has <u>no</u> intent to commit theft the first time, but <u>does</u> have an intent to commit theft before the second entry, he is <u>guilty</u> of theft.[7] If a defendant enters a house on multiple occasions but never forms the intent to commit theft until he is actually in the building, he is <u>not</u> <u>guilty</u> of Burglary." (Emphasis in original.)

The record shows the jury sent the same note back to the court but with question No. 2 highlighted—"Is there another lesser count available to the jury instead of Count 8, that charges the defendant with theft-absent an intent before entering the building?" The court next requested all parties appear.

Before the parties, the court noted it was still contemplating question 1(C) posed by the jury, and in particular the part of that question "whether a defendant formed the

---

7     The record shows the trial court noticed the response should have said "burglary" and not "theft" and stated it would make that correction.

37

intent while in the house would that satisfy the requirement for burglary." The court

further noted in the meantime it had checked the case law on this issue and had

considered its duty to answer the question in light of the prosecutor's decision not to rely

on "entry into the bedroom as a theory in the case." The court noted the law from the

"use notes" specifically stated that "entry into a bedroom within a single family house

would be requisite intent and support a burglary conviction if that intent was formed only

after entry into the house. That answers 1(C) of the jury's question."

The record shows that the court stated it went "back and forth" regarding its duty

to answer fully the question posed by the jury (i.e., question No. 1(C)) and that it finally

decided it had an obligation to instruct the jury that "entry into the bedroom with the

requisite intent satisfies burglary" and that this instruction was "not . . . a theory, but it's

the law." Citing cases, the court noted it had a sua sponte duty to instruct a jury "on the

general principals of law relevant to the issues raised by the evidence that are necessary

for the jury's understanding of the case even in the absence of a request."

Mautofu's counsel objected to the court's "entire" proposed response to question

No. 1(C) because the jury in that question did not use the word "bedroom." Mautofu

instead urged the court to "advise the jury that once they [i.e., defendants] have entered a

structure, if the intent to commit a felony is formed it's not burglary." When the court

pointed out this was not the law, Mautofu's counsel stated, "Well, I know. But by

specifically saying the bedroom, when we have a case where things were taken from the

bedroom, and since the inquiry from the jury isn't regarding the bedroom, they're talking

about a garage, a backyard, things like that, I think it's nonresponsive and I think that it's prejudicial to the defendants."

Edwards's counsel joined in the objection and further stated that because the prosecutor's theory of burglary did not include entry into the bedroom, counsel did not address that theory in cross-examining witnesses or in his closing argument. As such, Edwards's counsel argued it would be unfair to raise this new theory at this time, although counsel recognized the law was correctly stated by the court.

The court responded that it had considered the issues raised by the defense, but that it also "considered the fact that in the questioning by all sides, and in the openings and in the closing arguments, other than [the prosecutor's] reference to the elements of burglary, nobody focused on burglary. The focus from all sides was on identification. That was what the focus was. Nobody focused on . . . the elements of robbery, the elements of assault with a semi-automatic, or the elements of burglary. [¶] Had this been a case where say the one charge was burglary and the questions were asked pertaining to the burglary and the room, and that was what the main subject of the case was about, my opinion might be different. But . . . I don't recall anybody arguing burglary or even mentioning it during closing arguments other than when [the prosecutor] put up the elements."

The court continued, "So I did consider the fact that the defense did not have the opportunity, and I do realize that it is a more helpful instruction to the D.A. I have considered that. I mean, like I said, I have struggled with whether or not to include this

39

language. But I also concluded that this is not just a theory, even though that word has been used and it's been described, it is the law. And I think the court has a duty to instruct the jury as to the law. [¶] And the jury specifically did, in 1(C), refer to the upstairs hallway, which of course, would be right outside of the bedroom door."

After further discussion, the court agreed to substitute "room within a building" for "bedroom" ostensibly to make the instruction more neutral so that it would not track the facts of the case. The court also declined to give a unanimity instruction but agreed to give a lesser-included instruction for count 8.

Over the defense's objection, the court thus provided the jury "additional clarification" in response to its question(s):

"In order to find a defendant guilty of Burglary, the defendant must have entered the building with the intent to commit theft.

"If, for example, a defendant enters a building twice, and he has no intent to commit theft the first time, but does have an intent to commit theft before the second entry, he is guilty of Burglary. If a defendant enters a house on multiple occasions but never forms the intent to commit theft until he is actually in the building, he is not guilty of Burglary with the following exception: If a defendant enters a room of a single-family house with the requisite intent he can be found guilty of Burglary if the intent was formed after the defendant entered the house.

"As to a lesser included offense to Count 8, you might find a defendant guilty of theft if you find the defendant has committed all of the elements of theft beyond a

40

reasonable doubt and is not guilty of the Burglary. The Court will instruct you as to the appropriate instructions for theft orally as soon as they are available and provide you with verdict forms for theft should you need them."

The record shows the jury next requested a new verdict form for count 8, noting it had "MADE AN ERROR."

2. Guiding Principles and Analysis

As noted by the trial court in this case, a court must "instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Lopez* (1998) 19 Cal.4th 282, 287.) This duty arises when the trial record contains substantial evidence supporting application of the instruction. (*People v. Shockley* (2013) 58 Cal.4th 400, 403. We determine whether a jury instruction correctly states the law under a de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Our review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law." (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.)

A jury is presumed to have understood and followed a court's instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 [noting "we and others have described the presumption that jurors understand and follow instructions as '[t]he crucial assumption underlying our constitutional system of trial by jury' "].) " ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and

41

capable of understanding and correlating all jury instructions which are given."
[Citation.]' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Here and *without* regard to the trial court's "clarification" instruction, we independently conclude there was more than sufficient evidence to support a finding that Mautofu formed the requisite intent to commit theft before he *first* entered the Nash house. Indeed, the record shows that Mautofu and the rest of the group were not invited to the party and that nobody at the party knew them; that when Mautofu and the others in the group arrived, they told partygoers they were part of a "blood -- deep valley blood gang"; that Mautofu and the others in the group brought a weapon to the party; and that right after Mautofu and the group walked through the Nash's front door, they were seen "walking around, exploring the house" and "looking for things." This evidence alone supports the finding Mautofu initially entered the Nash house with the requisite intent to commit theft. (See *In re Leanna W.* (2004) 120 Cal.App.4th 735, 741 [noting "in reviewing the sufficiency of evidence to support a burglary finding, the requisite intent is rarely demonstrated by direct proof, and as a result, may be inferred from facts and circumstances" and further noting "evidence such as theft of property from a dwelling may create a reasonable inference that there was intent to commit theft at the time of entry"].)

What's more, the record also shows that Mautofu and others in the group were inside *and* outside the house, including in the backyard and the front yard, for about an hour while at the party. As the trial court correctly noted, even if Mautofu did not

42

possess the requisite intent to commit theft when he first entered the Nash house, we conclude the record contains substantial evidence to support the finding that at some point before he *reentered* the house he possessed the requisite intent to commit theft to support a conviction on count 8.

However, even if we considered the trial court's instruction in response to question No. 1(C), we would still uphold the burglary conviction of Mautofu. First, as the parties' admitted, the court's "clarification" instruction was a correct statement of the law. Second, regardless of whether the prosecutor for tactical reasons elected not to argue that Mautofu formed the requisite intent inside the home, but before he and/or one of the other group members broke into the locked bedrooms located upstairs, our review of the record shows this exact issue was in fact raised by the evidence—as the jury itself correctly recognized when it posed question No. 1(C) in the first place. As such, we independently conclude the court had a sua sponte duty to instruct the jury on the general principles of the law related to this issue. (See *People v. Lopez*, *supra*, 19 Cal.4th at p. 287.)

Third, although Mautofu claims it was unfair under the circumstances for the court to give the "clarification" instruction, we note the absence in the record of any request by Mautofu to reopen argument and address the jury with respect to this particular instruction. We also note, as did the trial court, that the defense in closing argument did not even address count 8—including the specific issue of whether or not Mautofu possessed the requisite intent to commit theft before (or after) he first entered the Nash

house.  Rather, the record shows defense counsel instead focused on the alleged lack of credible evidence linking Mautofu (as opposed to codefendant Liulamaga) to the robbery.

Thus, even *if* the trial court erred in instructing the jury in response to question No. 1(C), we conclude under these circumstances any such error was harmless because it is not reasonably probable a result more favorable to Mautofu would have resulted absent the instruction.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

3.  Unanimity Instruction

Mautofu (joined by Edwards) alternately contends the trial court erred in not giving a unanimity instruction once it decided to give the jury the "clarification" instruction in response to question No. 1(C).  According to Mautofu, a unanimity instruction was required because "some jurors could have concluded that the factual burglary occurred when one or more of the defendants entered the home while others . . . could have concluded the factual burglary occurred after entry of the home but before entry to a room."

Instruction on unanimity is required where the evidence suggests more than one discrete crime, and the prosecution has not elected among them.  Instruction on unanimity is not required, however, where a single criminal event is prosecuted under different theories of liability.  (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.)  Thus, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory'

44

whereby the defendant is guilty. [Citation.] The crime of burglary provides a good illustration of the difference between discrete crimes, which require a unanimity instruction, and theories of the case, which do not. Burglary requires an entry with a specified intent. (Pen. Code, § 459.) If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts. If, however, the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction. [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132-1133.)

Our high court's decision *People v. Taylor* (2010) 48 Cal.4th 574 also informs our decision on this issue. There, the court rejected an argument similar to the one made by Mautofu when it concluded a unanimity instruction was not required after the prosecution presented two distinct factual scenarios in support of its burglary theory, including attempting to show a burglary occurred when the defendant first entered the victim's home "and/or when he entered the back bedroom [i.e., a separate room] where he committed the sexual assaults" of the victim. (*Id.* at p. 627.) The court noted that such evidence did not show "the commission of two discrete burglaries requiring a unanimity instruction. Rather, the evidence and argument on alternative 'entries' bore on the issue of when defendant's felonious intent arose -- whether before entry into the home and/or before entry into the back bedroom -- and thus concerned the theory of his liability for a

45

singular burglary.  '[T]he evidence merely present[ed] the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.' ([*People v.*] *Russo*, *supra*, 25 Cal.4th at p. 1135.)  Under these circumstances, juror unanimity was unnecessary."  (*People v. Taylor*, *supra*, at pp. 627-628.)

Relying on *People v. Russo* and *People v. Taylor*, we likewise conclude that the evidence shows only one discrete crime and that the evidence and argument on alternative theories of when Mautofu and the others in the group possessed the requisite intent—whether before entry into the Nash house or after entry, but before entry into the locked upstairs bedroom(s)—"concerned the theory of his liability for a singular burglary."  (See *People v. Taylor*, *supra*, 48 Cal.4th at p. 628.)  We thus conclude under the circumstances juror unanimity was unnecessary.

D.  *Sentence on Gang Enhancement*

Mautofu (joined by Edwards) contends (in supplemental briefing) that the 10-year sentence imposed under section 186.22, subdivision (b)(1)(C) on the assault with a semiautomatic firearm conviction in counts 4, 5, 6 and 7 must be reduced to a five-year sentence under subdivision (b)(1)(B) of that same statute because assault with a firearm under section 245, subdivision (b) is a serious, and not a violent, felony.  The People agree.

Briefly, section 186.22, subdivision (b)(1) provides in part that "any person who is convicted of a felony committed for the benefit of, at the direction or, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any

criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony . . . of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (B) If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years. [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

We note a violation of section 245, subdivision (b) is not one of the enumerated felonies listed in section 667.5, subdivision (c). In addition, we further note that while Mautofu was charged with personal use of a firearm under section 12022.53, it was not "charged and proved" he used a firearm as provided in subdivision (a) of section 12022.3, section 12022.5 or 12022.55, as required by subdivision (c)(8) of section 667.5.

However, like the parties we note assault with a semiautomatic firearm is a serious felony as defined under subdivision (c)(31) of section 1192.7. As such, we agree Mautofu (and Edwards) should be sentenced under counts 4, 5, 6 and 7 to an additional term of five years under section 186.22, subdivision (b)(1)(B), as opposed to the 10-year term he received under subdivision (b)(1)(C) of that same statute.

E. *Pleading of Gang Enhancement*

Finally, Mautofu (joined by Edwards) contends (in supplemental briefing) that all of his gang enhancements must be reversed or, alternatively, that the sentences on such enhancements be reduced to the appropriate sentence under section 186.22, subdivision

47

(b)(1)(A), because the district attorney in the amended information pleaded the gang enhancement under section 186.22, subdivision (b)(1) without specifying whether (A), (B) or (C) of subdivision (b)(1) was being sought.[8]

Here, a review of the record shows that Mautofu in the amended information was charged *in each offense* with committing a felony "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct" within the meaning of section 186.22, subdivision (b)(1). Thus, the crimes and enhancements set forth in the amended information alleged "every fact necessary to place appellant on notice" (see *People v. Ramirez* (2003) 109 Cal.App.4th 992, 1000) that potentially he was subject to punishment under the criminal gang enhancement beyond the prescribed statutory maximum punishment for each felony count.

In addition, once the jury determined Mautofu committed counts 1 through 8 for the benefit of, at the direction of, and in association with a criminal street gang, findings he does *not* dispute on appeal, in our view it then became a matter for the trial court at sentencing to determine whether the qualifying felonies were "serious" or "violent," as

[8]    We note our high court in *People v. Le* (2015) 61 Cal.4th 416, 424, footnote 5, raised this issue—albeit in a different context—but ultimately did not decide it because the parties there agreed that pleading the section 186.22, subdivision (b)(1) gang enhancement—without specifying whether the felony was serious or violent or neither— was permissible "because the state cannot know until the jury's verdict whether defendant will be convicted of other charged crimes, enhancements, or lesser offenses that may dictate which subparagraph of subdivision (b)(1) is applicable."  As such, the court in *People v. Le* expressed "no opinion" on the issue.  (*Ibid.*)

those terms are respectively used in subdivision (b)(1)(B) and (C) of section 186.22, or neither as provided in subdivision (b)(1)(A) of that statute.  (See *People v. Taylor* (2004) 118 Cal.App.4th 11, 22 [noting that " '[s]ection 1192.7, subdivision (c), lists some felonies that are per se serious felonies' " and that if a defendant's "current conviction falls within this group of crimes, 'then the question whether that conviction qualifies as a serious felony is entirely *legal*' " (italics added)]; compare *People v. Mancebo* (2002) 27 Cal.4th 735, 738 [noting trial court erred when it substituted in the "multiple victim circumstance" (§ 667.61, subd. (e)(5)) that was *not* expressly alleged or included in the information for the "gun use circumstance" (*id.*, subd. (e)(3)) that was expressly alleged in order to "free up gun use as a basis for imposing additional section 12022.5(a) enhancements" and noting as such, the "pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under section 667.61, subdivision (a) *and* use the circumstance of gun use to secure additional enhancements under section 12022.5(a)"].)

Because the record shows Mautofu was properly put on notice he was subject to increased punishment under section 186.22, subdivision (b)(1) for the felonies in counts 1 through 8, which as a matter of law were either "serious" (i.e., § 1192.7, subd. (c)(31)—§ 245, subd. (b) [assault with a semiautomatic weapon (counts 4, 5, 6 & 7)]) or "violent" (i.e., § 667.5, subds. (c)(9) & (c)(21)—§ 211 [robbery (counts 1, 2 & 3)] & § 459

49

[burglary (count 8)], respectively), we reject his contention the amended information provided inadequate notice of the criminal gang enhancements.[9]

DISPOSITION

We remand for resentencing the gang enhancements in counts 4, 5, 6 and 7 because the offense of assault with a semiautomatic weapon (§ 245, subd. (b)) is a "serious" and not a "violent" felony for purposes of section 186.22, subdivision (b)(1)(B) and (C). After resentencing, the trial court is directed to prepare amended abstracts of judgments for Edwards and Mautofu and to forward certified copies of the corrected abstracts to the Department of Corrections and Rehabilitation. In all other respects, we affirm the judgments of convictions.

BENKE, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

---

[9]     In light of our decision, it is unnecessary to decide the People's alternate contention that Mautofu waived or forfeited his contention the amended information provided inadequate notice of the criminal gang enhancements by his failure to raise the issue in the trial court.